**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MIDDLE EAST FORUM, DANIEL PIPES, AND GREGG ROMAN<br><br>     *Petitioners*,<br><br>       v.<br><br>U.S. DEPARTMENT OF JUSTICE, U.S. ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF PENNSYLVANIA,<br><br>     *Respondents*. | No. _____ |

**PETITION TO MODIFY OR SET ASIDE CIVIL INVESTIGATIVE DEMANDS
AND MEMORANDUM OF POINTS AND AUTHORITIES**

1

**INTRODUCTION AND MOTION**

Here we go again. This appears to be the latest in a series of *qui tam* actions by activists seeking to weaponize the False Claims Act against political opponents. It's also the latest in a series of virtually identical investigations targeting small non-profit organizations with unduly burdensome civil investigative demands related to Second Draw PPP Loans. Conveniently, the investigations almost always involve amounts that aren't cost-effective to litigate. Equally conveniently, they involve simple theories, but the investigations drag out for months or years while DOJ demands large settlements lest the non-profit organization be buried with broad CIDs.

The Court need not reach those issues because the CIDs—2025-T-1073 to Daniel Pipes and 2025-T-1074 to Gregg Roman—were never properly served. Had those CIDs been served, they would still need to be limited or set aside: Limited based on lack of relevance under controlling Supreme Court precedent, or set aside in toto given the Middle East Forum's extensive document production and the gross disproportionality of demanding oral testimony. To the extent testimony does occur, it should be subject to a protective order given the well-documented history of threats against MEF and its personnel. The need for such an order is apparent given the involvement of a relator's counsel with a history of anti-Semitic statements and anti-Israel activism.

MEF, Pipes, and Gregg Roman accordingly move to set aside or limit CID 2025-T-1073 to Daniel Pipes and CID 2025-T-1074 to Gregg Roman. Alternatively, they move for a protective order limiting disclosure of all MEF information, and requiring that any testimony occur via video.

**BACKGROUND**

THE PAYCHECK PROTECTION PROGRAM

In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116–136, § 1102, 134 Stat. 281, 286-94, to provide assistance to persons affected by the coronavirus pandemic. As relevant here, Section 1102 of the CARES Act temporarily

2

permitted the Small Business Administration ("SBA") to guarantee loans under a new program—titled the "Paycheck Protection Program" or "PPP"—pursuant to section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)). Section 1106 of the CARES Act also provided for forgiveness of qualifying PPP loans.

The Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the "Economic Aid Act" or "EAA"), Pub. L. 116–260, 134 Stat. 1993 (2020), followed. Section 311 of the EAA added a new temporary section 7(a)(37) to the Small Business Act (15 U.S.C. 636(a)(37)). This new section authorized SBA to guarantee so-called Second Draw Loans, generally under the same terms and conditions as the original PPP. But the definition of "eligible entity" in the EAA differed. It:

> (III) does not include—
> (aa) ****
> (bb) any business concern or entity primarily engaged in political or lobbying activities, which shall include any entity that is organized for research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents;

134 Stat. at 2002.

On January 14, 2021, SBA issued an Interim Final Rule addressing PPP eligibility. Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by Economic Aid Act, 86 Fed. Reg. 3,692 (Jan. 14, 2021). In its IFR, SBA recognized it had issued a bewildering array of statements about eligibility, and the agency itself was struggling to sort through the mess. *See* 86 Fed. Reg. at 3,693. Further complicating things, SBA acknowledged that lending decisions required consideration of legal issues beyond the CARES Act and EAA, "including the First Amendment to the Constitution," 86 Fed. Reg. at 3,711. SBA made clear, however, that its overarching concern was speed: it dispensed with loan-specific authorizations "in order to ensure that critical PPP loans are disbursed as efficiently as practicable." 86 Fed. Reg. at 3,709.

3

On the same day, SBA issued a separate Interim Final Rule addressing Second Draw PPP Loans. Business Loan Program Temporary Changes; Paycheck Protection Program Second Draw Loans, 86 Fed. Reg. 3,712 (Jan. 14, 2021). The Second Draw IFR explained that "Second Draw PPP Loans generally are guaranteed by SBA under the same terms, conditions, and processes as First Draw PPP Loans," and "are subject to SBA's and the Department of the Treasury's (Treasury's) consolidated interim final rules implementing updates … for First Draw PPP Loans" "except as specified in this IFR." 86 Fed. Reg. at 3,713. As relevant here, SBA elaborated on the statutory language with respect to the lobbying ban, specifying the following in the operative regulation for ineligibility:

> [A] business concern or entity primarily engaged in political activities or lobbying activities, <u>as defined in section 3 of the Lobbying Disclosure Act of 1995</u> (2 U.S.C. 1602), including any entity that is organized for research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents[.]

86 Fed. Reg. at 3,718-19.

Numerous non-profit organizations understood those criteria to restrict only entities "primarily engaged in political activities or lobbying activities." And its contemporaneous statements make clear that SBA did, too. When one non-profit informed SBA that it was a think tank but didn't engage in political or lobbying activities, SBA's response was "go get the money." Ostrye Dec. at OSTRYE-026. Plainly, SBA employees didn't believe think tanks were *per se* not eligible.

Like other non-profit organizations, MEF took out a $258,185 Second Draw PPP Loan. That loan was forgiven on October 26, 2021.

### DOJ Responds to the President's and Congress's Ire

Enter politics. In May 2021, Attorney General Garland established a "COVID-19 Fraud Enforcement Task Force to marshal the resources of the Department of Justice in partnership with agencies across government to enhance efforts to combat and prevent pandemic-related fraud." St.

John Dec. Exh. 21. That – and the "more than 1,000 criminal cases" initiated by the COVID-19 Fraud Enforcement Task Force weren't enough for the President. St. John Dec. Exh. 22. President Biden announced that "the Department of Justice will escalate our efforts to crack down on bad actors" with respect to COVID-related loan programs. *Id.* Congress began bombarding Attorney General Garland with letters regarding those efforts, and began holding hearings on PPP Fraud.[1]

DOJ needed to do *something* to show results. So following in a long tradition of government bean counters who count the wrong beans, DOJ started targeting non-profit organizations and aggressively pursuing them for purported FCA liability. And its theories have shifted over time: notwithstanding SBA contemporaneous position to the contrary, DOJ now contends that any non-profit organization that at some point identified itself as a think tank violated the False Claims Act. The sheer number of reputable organizations that stand accused of precisely the same false claims stands out. Indeed, the number is so large that DOJ apparently uses a nationally-standard form letter to initiate contact. *Compare* Prosser Dec. Exh. 10 *with* Ostrye Dec. at OSTRYE-077. Equally apparent is DOJ's habit of pursuing claims that are large enough to seem substantial in a press release, but not large enough for a defendant non-profit to cost-effectively litigate.

## DOJ'S CONTACT WITH MEF

In late May 2024, DOJ sent a contact letter to MEF, stating "this Office is investigating whether the Middle East Forum falsely certified in its second draw loan application that it was 'not a business concern or entity primarily engaged in political or lobbying activities, including any entity that is organized for research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents." Prosser Dec. Exh. 10. MEF

---

[1] https://oversight.house.gov/hearing/federal-pandemic-spending-a-prescription-for-waste-fraud-and-abuse/

retained counsel and reached out to DOJ. And MEF cooperated with DOJ's document demand by producing over 1,700 documents to DOJ. Prosser Decl. & Exh. 13.

THE ORAL TESTIMONY CIDS

On August 18, 2025, DOJ apparently issued CID 2025-T-1073 to Daniel Pipes and CID 2025-T-1074 to Gregg Roman. Prosser Exhs. 11, 12. Mr. Pipes is MEF's semi-retired founder; he moved away from Pennsylvania before the CIDs were issued. Prosser Decl. And Mr. Roman is MEF's Secretary and Executive Director; he relocated to Israel before the CIDs were issued. *Id.* Nevertheless, DOJ simply mailed the CIDs to a mailbox address used by MEF for security reasons. The nature of that address is readily apparent from a Google search. St. John Exhs. 23, 26.

DOJ then repeatedly referenced looming deadlines and threatened enforcement, while ignoring the obvious lack of service. Indeed, as recently as March 26, 2026, MEF's counsel reminded DOJ that "Mr. Roman is residing in Tel Aviv." St. John Exh. 25. But in early April, DOJ again inquired about dates for oral examinations, despite the obvious lack of service. DOJ again threatens to move to enforce. To avoid the risk of an *ex parte* motion to enforce, MEF, Pipes, and Roman move to set aside or modify the CIDs.

## JURISDICTION

This Court has jurisdiction over Petitioners' petition pursuant to 31 U.S.C. § 3733(j)(2) because Petitioners transact business in this judicial district.

## LEGAL STANDARDS

When "the Attorney General, or a designee … has reason to believe that any person may be in possession, custody, or control of any documentary material or information relevant to a false claims law investigation, the Attorney General, or a designee, may … issue in writing and cause to be served upon such person, a civil investigative demand requiring such person (A) to produce such documentary material for inspection and copying, … [or] (C) to give oral testimony concerning such

6

documentary material or information….." 31 U.S.C. 3733(a)(1). The permissible methods of service and the permissible locations for testimony are specified by the statute. *Id.* 3733(c), (d), (h)(3). The CID "may not require the production of any documentary material, the submission of any answers to written interrogatories, or the giving of any oral testimony if such material, answers, or testimony would be protected from disclosure under…the standards applicable to discovery requests under the Federal Rules of Civil Procedure." *Id.*

To be able to enforce a CID, the agency must show "[1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within the [agency's] possession, and [4] that the administrative steps required by the [authorizing statute] have been followed." *United States v. Clarke*, 573 U.S. 248, 250 (2014) (quoting *United States v. Powell*, 379 U.S. 48, 57-58 (1964)). However, the "deferential attitude which courts usually apply to business related subpoena enforcement requests from agencies whose subject matter jurisdiction is unquestioned, has no place where political activity and association … form the subject matter being investigated." *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 387 (D.C. Cir. 1981).

In reviewing a CID, "the district court's role is not that of a mere rubber stamp, but of an independent reviewing authority called upon to insure the integrity of the proceeding." *Wearly v. FTC*, 616 F.2d 662, 665 (3d Cir. 1980). That role "is neither minor nor ministerial," and "federal courts stand guard … against abuses." *CFPB v. ACICS*, 854 F.3d 683, 688-89 (D.C. Cir. 2017). "Such an abuse would take place if the [CID] had been issued for an improper purpose, such as to harass the [recipient] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58. A ruling enforcing or setting aside a CID is a dispositive matter and a final appealable order. 31 U.S.C. 3733(j)(5); *see also EEOC v. City of Long Beach*, 866 F.3d 93, 100-101 (3d Cir. 2017); *NLRB v. Frazier*, 966 F.2d 812 (3d Cir. 1992).

7

**ARGUMENT**

**I.        The CIDs are not enforceable because they were not properly served.**

Service in accordance with the False Claims Act is the most basic statutory requirement of an enforceable CID. For persons in the United States, service can be made by "delivering an executed copy." 31 U.S.C. 3733(d)(2). That means personal service. *See Katz v. Beebe Healthcare*, 2024 U.S. Dist. LEXIS 226813, at *15-16, 18 (D. Del. Dec. 16, 2024) (compiling cases: "delivering a copy" has "long been interpreted to require personal service" such that delivery to a lawyer or employer is inadequate). Alternatively, service can be made by "depositing an executed copy … in the United States mails by registered or certified mail, with a return receipt requested, addressed to the person at the person's residence or principal office or place of business." 31 U.S.C. 3733(d)(2). Neither method can be used outside the country. Rather, for service "upon any person who is not found within the territorial jurisdiction of any court of the United States [service may be made] in such manner as the Federal Rules of Civil Procedure prescribe for service in a foreign country." 31 U.S.C. 3733(c)(2). The Roman and Pipes CIDs fail on all grounds.

There was no attempt at personal service. Rather, the CIDs were mailed to a "virtual office" that MEF uses as a mail drop for security reasons. Prosser Decl. & Exhs. 11-12. That the address is only a mail drop is no secret: it's readily apparent from a Google search. St. John Exhs. 23, 26. That mail drop certainly isn't Mr. Roman's or Mr. Pipes's "residence or principal office or place of business" as required for mail service of a CID on a person within the United States. 31 U.S.C. 3733(d)(2).

The lack of service on Mr. Roman is even more egregious. He relocated to Israel before the CID was issued. Prosser Decl. Because the FCA expressly requires compliance with the Federal Rules of Civil Procedure for service in a foreign country, 31 U.S.C. 3733(c)(2), service on Mr. Roman would require compliance with the Hague Convention, Fed. R. Civ. P. 4(f)(1); 20 U.S.T. 361. And Petitioners are unaware of any request for Hague Convention service, despite DOJ knowing that Mr. Roman lives

abroad. Indeed, as recently as March 26, 2026, MEF's counsel reminded DOJ that "Mr. Roman is residing in Tel Aviv." St. John Exh. 25.  DOJ nevertheless threatened to move to enforce the CIDs, despite their never having been properly served. Out of an abundance of caution and to avoid the risk of an *ex parte* enforcement order on invalid CIDs, MEF, Mr. Pipes, and Mr. Roman move to set aside the CIDs.

## II.    Any discovery should be subject to a confidentiality order.

To the extent any oral testimony does occur, it should be subject to a confidentiality order pursuant to this Court's inherent power, *In re Avandia Marketing, Sales Prac. & Prods. Liability Litig.*, 924 F.3d 662, 671 (3d Cir. 2019), and the Federal Rules of Civil Procedure, which apply to FCA CIDs, *see* 31 U.S.C. § 3733(b)(1)(B).

Start with the need for protection. MEF and its personnel have long-been targeted for violence. At one point, a photo of Mr. Pipes was even featured in the Islamic State of Iraq and Syria's ("ISIS") *Dabiq* magazine, identifying him as a "wicked Jew who mocked rasulullah [the messenger]":



Yadin Decl. The surrounding text explained the "clear-cut obligation to kill those who mock the messenger." *Id.* Not surprisingly, MEF was contacted by the FBI and undertook security measures.

9

Although Mr. Pipes being featured by ISIS as someone who should be killed was especially notable, that threat was not isolated. In 2024, for example, Mr. Roman received an email stating, in part:

> May the wails of the thousands of women and children you have directly massacred in Gaza continue to haunt you in your nightmares, and **may you taste a slow painful death**. There is no going back from this.
>
> * * * * *
>
> God's justice is never far from those who are supporting the baby-killers. You have too much innocent blood on your hands. **Its only a matter of time. accountability cannot be circumvented.**

*Id.* Other MEF personnel have received similar messages, and MEF has had repeated contacts with federal law enforcement regarding threats. *Id.* MEF was most recently contacted by the FBI last week regarding a targeted attack seeking MEF's information. *Id.*

The risk of unknown relators and their counsel having access to MEF's information is of specific concern. *See* 31 U.S.C. 3733(a)(1) (providing that DOJ "may" share information with a relator). Here, MEF has learned at least one relator is represented by an anti-Israel activist—Abdel-Rahman Hamed—who is publicly hostile to organizations like MEF and its employees. St. John Exh. 27. Mr. Hamed has proclaimed his desire to "deny, defy, and defeat Zionists." St. John Exh. 28. He has spent his career putting that desire into action.

Mr. Hamed has urged employers to refuse to hire "Zionists from the Biden Admin." St. John Exh. 29. He has represented individuals who were found with weapons, "pro-terror materials, including Hamas and Hezbollah flags and signs that read 'death to America' and 'death to Jews.'" St. John Exh. 30. And he is presently defending individuals and organizations who distributed a primed-and-coordinated media "toolkit" immediately after the October 7, 2023, massacre. St. John Exhs. 31, 32. That "toolkit" characterized the murder of more than 1,200 innocent men, women, and children as "a historic win for the Palestinian resistance: across land, air, and sea, our people have broken down the artificial barriers of the Zionist entity." St. John Exhs. 31, 33.

The FCA must not be a tool for hostile extremists to gain access to confidential information. "Courts have inherent power to grant orders of confidentiality over materials not in the court file." *In re Avandia Marketing,* 924 F.3d at 671 (quoting *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 785 (3d Cir. 1994)). That power attaches whenever judicial process is used to obtain the information. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984). And judicial process is what DOJ ultimately relies on to enforce the non-self-executing CIDs at issue here. Regardless of whether the power is viewed as inherent, authorized by Rule 26(c), or authorized by Rule 45(d), Petitioners need only show good cause to obtain protection. The risk of violence quintessentially satisfies that standard.

The risk is not confined to Mr. Pipes and Mr. Roman. Topics as broad as the "duties and responsibilities" of MEF's long-time senior executives and "the nature of all expenditures by MEF" will likely reveal details of MEF's operations that are highly confidential. Put differently, Mr. Pipes and Mr. Roman are public figures, but MEF's employees and MEF's contacts are not. Those individuals should not be exposed to the risk of violence or opprobrium from their association with MEF, and MEF's efforts should not be compromised by giving persons hostile to MEF access to its non-public information. Doing so would seriously disrupt and hinder MEF's ability to do its work. Against those weighty concerns there is little to balance. The public has no right of access to discovery material. And the FCA itself is designed to protect the respondent's privacy interests. Any MEF information should be subject to a confidentiality order.

**III.    The CIDs are grossly disproportionate, such that they should be set aside or limited.**

    **A. After nearly two years of investigation into a $258,185 loan, oral examinations are grossly disproportionate.**

The remaining question is whether oral examinations are warranted and proportionate, particularly given the extensive document production MEF already provided. "The purpose of [a] CID is to 'enable the Government to determine whether enough evidence exists to warrant the expense of filing [a civil] suit, as well as to prevent the potential Defendant from being dragged into

court unnecessarily.'" *United States v. Witmer*, 835 F. Supp. 208, 211 (M.D. Pa. 1993) (quoting H.R. Rep. 99-660 at 26 (1986)). It's an extraordinary tool, and "Congress … did not intend the CID to be used routinely." *Id.* at 218. Indeed, originally only the Attorney General could issue CIDs, and he was forbidden from delegating that authority. Pub. L. 99-562, 100 Stat. 3153, 3159 (1986); *see also Moog v. United States*, 1991 U.S. Dist. LEXIS 13364, at *2 (W.D.N.Y. Mar. 29, 1991).

Although Congress expanded the authority to issue CIDs, it has consistently maintained two key limitations: First, FCA CIDs can only be issued and served prior to the government filing suit or making an election on a relator's suit, *i.e.*, presumptively within 60 days of the relator's suit being filed. *See* 31 U.S.C. 3730(b), 3733(a)(1). That's an important clue as to the level of discovery Congress contemplated. Second, FCA CIDs are generally subject to the same standards as discovery in ordinary civil litigation. *See* 31 U.S.C. 3733(b)(1)(B). That includes the requirements for relevance, avoiding undue burden, and proportionality. Thus, when this Court ultimately enforced a CID in *Witmer*, it did so only after considering the cost of compliance when weighed against the respondent's net worth and the amount of the alleged fraud, as well as DOJ's willingness to undertake any necessary travel. 835 F. Supp. at 220.

Here, in the nearly two years since its May 2024 contact letter, DOJ has purported to investigate whether MEF is "business concern or entity primarily engaged in political or lobbying activities." Prosser Exh. 10. Webster's teaches us that "primarily" means "for the most part" or "chiefly." In common parlance, that's more than half. If MEF is "primarily engaged" in those activities, it should be fairly obvious. It certainly should be reflected in the approximately 1,700 documents MEF produced to DOJ. To the extent DOJ now believes any organization that ever identified itself as a think tank was ineligible for a Second Draw PPP Loan, that should be even more obvious.  Yet DOJ has identified only two documents that it's particularly interested in: MEF's loan application, and a single email chain. Such minutiae can't carry the day. The FCA "is not an all-purpose

antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs. v. United States ex rel Escobar*, 579 U.S. 176, 194 (2016).

Continued investigation can only be a fishing expedition or pressure to settle. Perhaps the FCA does permit some amount of fishing. But the statute contemplates rapid decisions, not preparation for trial: the default is that no CID can issue more than 60 days after a relator files suit. DOJ should not be read to permit DOJ to burden a small non-profit with years of attorney fees and discovery over a $258,185 loan, followed by even more attorney fees as its founder and its executive director are deposed.

Further, in view of the political pressure, the relatively small amount of the loan, the lengthy and disproportionate investigation, and DOJ's exorbitant settlement demands, there is an inference that CIDs are not being used merely to facilitate decision-making. *See Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct.*, 482 U.S. 522, 546 (1987) (noting that "discovery may be sought for the improper purpose of motivating settlement, rather than finding relevant and probative evidence"); *FTC v. Bisaro*, 2010 U.S. Dist. LEXIS 83741, at *15-16 (D.D.C. July 13, 2010) (recognizing possibility of same vis-à-vis CID). The Court is "not required to exhibit a naiveté from which ordinary citizens are free." *DOC v. New York,* 588 U.S. 752, 785 (2019). That burden is inherently undue.

### B. Heightening the disproportionality, the CIDs are facially overbroad.

With respect to scope, the CIDs don't specify any limitation as to time, leaving them facially overbroad. The EAA, SBA's elaboration on the statutory text, and the certification at issue are all written in the present tense, such that the only relevant date is the date of the certification itself. Even if that were not true, First Amendment constraints require that the relevant time period cannot extend beyond the date of loan forgiveness. That's because Congress can set "conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize," but the First Amendment forbids "conditions that seek to leverage funding to regulate speech outside

the contours of the program itself." *Alliance for Open Society, Int'l, Inc. v. U.S.A.I.D.*, 570 U.S. 205, 214-16 (2013). Thus, for example, Congress could not condition participation in a spending program on a citizen yielding its First Amendment rights once it is no longer receiving government funds. *See Autor v. Pritzker*, 740 F.3d 176, 183 (D.C. Cir. 2014). Here, the eligibility restriction relates to speech, such that the First Amendment plainly applies. Accordingly, after the Second Draw Loan was forgiven, *i.e.*, after October 26, 2021, MEF's activities were outside any Second Draw restriction and are not relevant. The CID should accordingly be modified or limited to preclude inquiry into irrelevant time periods.

## CONCLUSION

MEF is likely to prevail on the merits, and fully reserves its defenses and counterclaims. But for purposes of this petition, it's enough that DOJ has had almost two years to develop its theories. Enough is enough. DOJ's CIDs should be SET ASIDE and MEF should be awarded its costs and attorney fees to the extent provided by law.

Alternatively, compliance should be conditioned on DOJ's following the Federal Rules of Civil Procedure for deponents. In general, a subpoena may command attendance "within 100 miles of where the person resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c)(1)(A). Even then, the party requiring attendance must pay for the witness's travel, subsistence, etc. 28 U.S.C. 1821. Here, of course, Mr. Pipes splits his time between Florida and locations other than Pennsylvania, and Mr. Roman lives in Israel. In discussions, DOJ was not opposed to taking testimony via video. To avoid unduly burdening MEF, Mr. Pipes, and Mr. Roman, compliance with the CIDs should be expressly conditioned on their being conducted via video.

Dated: May 4, 2026

Respectfully submitted,

*/s/ Calli J. Padilla*
CALLI J. PADILLA
ARTHUR FRITZINGER
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel. 215-665-6938
cpadilla@cozen.com
afritzinger@cozen.com

*/s/ Joseph S. St. John*
JOSEPH S. ST. JOHN (LSB 36682)*
ST. JOHN LLC
1701 Jefferson Avenue
New Orleans, LA 70115
Tel. (410) 212-3475
scott@stjohnlaw.com
* *pro hac vice forthcoming*

15